UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOLLY M. ELLISON,

      Plaintiff                            Civil Action No. 18-14085

v.                                    HON.  MARIANNE O. BATTANI
                                    U.S. District Judge
                                    HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Holly M. Ellison ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits  and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Docket #25] be GRANTED and that Plaintiff's motion [Docket #21] be DENIED.

-1-

## I.  PROCEDURAL HISTORY

On September 8, 2016, Plaintiff filed applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") alleging disability as of June 21, 2013[1]

(Tr. 201, 205).  Following the initial denial of benefits, Plaintiff requested an administrative

hearing, held on February 12, 2018 in Toledo, Michigan (Tr. 37).  Administrative Law Judge

("ALJ") Mary D. Morrow presided.   Plaintiff, represented by non-attorney representative

Dannelly C. Smith, testified (Tr. 49-80), as did Vocational Expert ("VE") Joseph Thompson

(Tr.80-84) and lay witness Sam Gutierrez (Tr. 85-90).  On May 2, 2018, ALJ Morrow found

Plaintiff not disabled (Tr. 30-31).  On October 3, 2018, the Appeals Council denied review

(Tr. 6-8).  Plaintiff filed for judicial review of the final decision on December 28, 2018.

## II.  BACKGROUND FACTS

Plaintiff, born May 13, 1981, was 11 days short of her 37th birthday at the time of the

administrative decision (Tr. 31, 201).  She completed three years of college and worked

previously as a receptionist and sales associate (Tr. 243).  She alleges disability as a result

of anxiety, schizophrenia, depression, and chronic fatigue (Tr. 242).

### A.  Hearing Testimony

---

[1]An earlier claim for DIB was denied on January 16, 2015 (Tr. 20, 45).  Therefore, the period under consideration in the current application is from then to the May 2, 2018 determination (Tr. 20-21).

### 1. Plaintiff's Testimony

Plaintiff offered the following testimony:

She stood 5' 6" and weighed about 150 pounds (Tr. 52).  She gained 40 pounds in the year before the hearing (Tr. 52).  She lived in a town home with her two children and boyfriend (Tr. 53).  Her medical care was funded by Medicaid (Tr. 53).  She had a driver's license but limited her driving to going to doctor's appointments (Tr. 54).  On her rare shopping trips, her boyfriend drove (Tr. 54).

Plaintiff's last job before ceasing work in 2011 was seasonal employment at a department store (Tr. 55).  Before that, she worked in another retail position and as a receptionist at an appliance company (Tr. 55-56).  In the receptionist position, she sat for at least six hours of an eight-hour shift and on a rare basis was required to lift up to 50 pounds (Tr. 56).  She also worked as a sales associate for two different entities (Tr. 57-58).  Both positions required her to stand for an entire eight-hour shift (Tr. 57-58).

Plaintiff typically arose at 8:00 a.m. to make sure that her son, eight, was dressed for school (Tr. 59).  Her 18-year-old child was not in school (Tr. 59).  Plaintiff retired at 9:00 p.m. (Tr. 59).  She did not have problems falling asleep and actually overslept (Tr. 60).  In addition to 11 hours of nighttime sleep, she required another eight hours of "naps" every day (Tr. 60-61).  Due to chronic exhaustion, Plaintiff did not cook, do dishes, perform laundry chores, or do outdoor chores (Tr. 61).  She had problems keeping track of her finances (Tr. 62).  During grocery shopping trips, she did not experience problems placing items in the cart

(Tr. 63).  She did not attend religious services, dine out, or go to movies (Tr. 63).  She was currently crocheting a blanket (Tr. 63).  She had a dog and a fish, both of which were cared for by either her boyfriend or children (Tr. 63).  On occasion, she was able to feed the dog and let him outside (Tr. 64).

Plaintiff was unable to work due to fatigue, auditory hallucinations, and lightheadedness upon standing (Tr. 64).  She was unable to stand for more than 20 minutes at a time (Tr. 64).  She could lift and carry a gallon of milk (Tr. 65).  She received psychological counseling until her therapist retired a few months before the hearing (Tr. 65).  At the time of the hearing, she was seeing a case manager on a monthly basis (Tr. 65).  She currently took an anti-psychotic medication (Tr. 66).  Despite the medication, she continued to experience auditory hallucinations (Tr. 66).  She also took medication for anxiety and depression prescribed by her treating physician (Tr. 67).  She denied medication side effects (Tr. 67).  Her dosage of the anti-psychotic medication was increased in response to her report that it was not quelling psychotic symptoms (Tr. 68).  She had not had inpatient psychiatric treatment since 2013 (Tr. 68).

Plaintiff smoked a pack of cigarettes every four days (Tr. 69).  She did not drink or use illicit drugs (Tr. 69).  She experienced mild memory problems characterized by the inability to remember names, dates, and movie plots (Tr. 69).  Due to concentrational problems, she absent-mindedly drove past her doctor's office on the way to an appointment and had trouble comprehending novels or religious material (Tr. 70).  She was able to follow

-4-

the directions on a bottle of prescription medicine (Tr. 71). She experienced irritability when family members "talk[ed] too much" (Tr. 71). Her family visited at least two or three times a month (Tr. 72). She had trouble making decisions (Tr. 71).

In response to questioning by her representative, Plaintiff denied alcohol use at the time of hearing (Tr. 73). In the past, she used alcohol to self-medicate when she heard voices (Tr. 73). She stopped drinking after learning that a treating source believed that she was an alcoholic (Tr. 74). She continued to hear voices following her release from the 2013 inpatient treatment (Tr. 75). She slept excessively due to chronic fatigue syndrome (Tr. 75). Prior to 2013, she took classes through an online university (Tr. 76). She took a six-month break from classes in early 2014 and resumed in July, 2014 through October, 2015 (Tr. 77). She took one or two classes each term (Tr. 79). During the time she was taking courses, she was not sleeping "at all," attributing her ability to function without sleep to bipolar disorder (Tr. 79). Prior to taking the online courses, she received an Associate's Degree from a community college (Tr. 78).

### 2. Testimony of Joseph Gutierrez

Plaintiff's boyfriend offered the following testimony:

He and Plaintiff had been together since 2008 (Tr. 85). After their son was born, they stayed briefly at Plaintiff's parents' house then moved into their own place (Tr. 85). He believed that Plaintiff was unable to work due to paranoia preventing her from taking care of her children, listening to the radio, or watching television (Tr. 86). Her pastimes were

limited to sewing a blanket (Tr. 86).  Plaintiff was responsible for getting their eight-year-old son to school (Tr. 88).  Plaintiff had "never been the same since" the 2013 hospitalization precipitated by visual and audio hallucinations (Tr. 88).  He was unable to say whether she had become worse since 2013 (Tr. 89).

## B.   Medical Evidence[2]

### 1. Treating Sources

 In September, 2013, Plaintiff was admitted for inpatient treatment for postpartum psychosis (Tr. 333).  She was assigned a GAF of 51 upon admittance[3] (Tr. 333).  Plaintiff reported delusions and that she had stopped taking previously prescribed medication (Tr. 334).  Upon discharge six days later, she exhibited improved insight and judgment (Tr. 333-334).  October, 2013 outpatient records note no symptoms of anxiety or depression but an "underactive thyroid" (Tr. 348).  Records from the following month note that Plaintiff's mood and energy were improved with a lowered dose of psychotropic medication (Tr. 471).

In January, 2015, Plaintiff reported to treating physician Arun Gupta, M.D. that she lacked motivation to get out of bed but admitted that she had stopped taking depression medication "awhile ago" (Tr. 395).  In March and April, 2015, Plaintiff sought treatment for

---

[2]Because an earlier claim for benefits was denied on January 16, 2015, the period under consideration in this application is from that date through ALJ Morrow's May 2, 2016 decision (Tr. 20, 31).  Evidence pertaining to Plaintiff's condition before that date, including the 2013 inpatient records, is included for background purposes only.

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.  *DSM-IV-TR*, at 34.

a sinus infection (Tr. 388, 391).  She reported that she had problems concentrating (Tr. 388, 391).  October, 2015 records by Tanvir Qureshi, M.D. state that Plaintiff appeared well groomed, fully oriented, and well nourished (Tr. 766).  He diagnosed her with an anxiety disorder (Tr. 766).  November, 2015 records note that Plaintiff was fully oriented and well nourished (Tr. 378).  She exhibited a mildly manic mood (Tr. 379).  Dr. Qureshi's February, 2016 records note that Plaintiff was fully oriented and well groomed (Tr. 760).  In June, 2016, Plaintiff appeared well groomed and alert with "blunted" affect (Tr. 601).  In August, 2016, Plaintiff reported symptoms of depression and sleep disturbances nearly every day (Tr. 359).

Psychiatric treatment records from the following month note that Plaintiff denied depression or anxiety but slept "all of the time" (Tr. 455).  She reported that she continued to hear voices but denied thoughts of harming others (Tr. 455).  In October, 2016, Plaintiff reported that she was able to go grocery shopping but was exhausted afterward (Tr. 593). The following month, she stated that she characterized her psychological condition as "not too bad" (Tr. 661).

January, 2017 records state that Plaintiff was unable to fill a prescription because she had to pick up her son from school (Tr. 686).  She exhibited good eye contact with full orientation, "clear and coherent" thoughts, and normal judgment (Tr. 652, 682).  Dr. Qureshi noted that Plaintiff denied hallucinations but endorsed anxiety and fatigue (Tr. 754).  In March, 2017, Plaintiff was advised that her drinking interfered with prescribed psychotropic

medications (Tr. 592).   Dr. Qureshi noted Plaintiff's denial of depression, anxiety, hallucinations, sleep disturbances, or suicidal thoughts (Tr. 741).  Plaintiff exhibited normal mood, affect and judgment and was "active and alert" (Tr. 738).  She exhibited a normal memory (Tr. 738).  The following month, Plaintiff reported no interest in anything, reporting that due to "chronic fatigue," she stayed in bed all day (Tr. 662).   She denied depression or anxiety (Tr. 657).  In June, 2017, Plaintiff reported that she was taking her son to see her mother (Tr. 652).  She exhibited a flat affect but was fully oriented with a normal thought process (Tr. 652).  July, 2017 records state that psychotic symptoms were moderately well controlled with medication (Tr. 591).   Plaintiff requested an amendment to her chart stating that "there is no evidence of alcohol use or abuse" (Tr. 621).  She reported that she was sleeping better but that chronic fatigue created a barrier to psychological recovery  (Tr. 631, 636).  In October, 2017 treating records note that Plaintiff was taking her medication as prescribed but exhibited low energy and was "responding to internal stimuli" during therapy (Tr. 589).  Dr. Qureshi's records from December, 2017 note normal mood, affect, judgment, memory, and orientation (Tr. 732).  In January, 2018, treating psychiatrist Paul Y. Gutterman found that due to "schizoaffective disorder bipolar type" and generalized anxiety, Plaintiff was unable to meet competitive work standards for most of the social, concentrational, and adaptive skills required for unskilled work (Tr. 583-584).  He found that Plaintiff would be expected to miss more than four days of work each month (Tr. 584).

-8-

### 2. Non-Treating Sources

In November, 2016, Kari Kennedy, Psy.D. performed a non-examining review of the treating records finding that Plaintiff's restrictions in daily living, social functioning, and concentration, persistence, or pace resulting from psychotic, affective, and anxiety-related disorders were mild (Tr. 98, 108).

### C. Vocational Expert Testimony

VE Joseph Thompson classified Plaintiff's former work as a receptionist as semiskilled and exertionally sedentary as described in the *Dictionary of Occupational Titles* ("*DOT*")(exertionally medium as actually performed) and sales associate, semiskilled/exertionally light[4] (Tr. 81-82). The ALJ then posed the following question to the VE, describing an individual of Plaintiff's age, education, and work background:

> The individual can perform at the medium exertional level with the following limitations. Perform simple, routine, repetitive tasks, but not at a production pace. So, for example, no assembly lines. Can respond appropriately to occasional interaction with supervisors and coworkers, with no team or tandem work with coworkers, and no interaction with the general public. The

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. The VE originally testified that the maintenance work was actually performed at the light level then corrected himself (Tr. 1110-1118). Plaintiff testified that the maintenance job was performed at the sedentary level (Tr. 1110).

individual is limited to tolerating few changes in the work setting, defined as routine job duties that remain static, and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently, and be adequately and easily explained. Could such an individual perform the claimant's past work? (Tr. 82).

The VE found the above restrictions would preclude all of Plaintiff's past relevant work but would allow for the unskilled, exertionally medium work of a janitor (800,000) positions in the national economy); detailer (60,000); and laundry worker (200,000) as well as the unskilled, exertionally light work of a folder (60,000); production inspector (40,000); and packer (60,000) and the unskilled sedentary work of a bench worker (25,000); bonder (35,000); and assembler (50,000) (Tr. 82-83).

The VE stated that if the same individual required unscheduled work breaks amounting to more than 20 percent of the workday, or, had one to two absences every month, all competitive work would be eliminated (Tr. 84).

**D. The ALJ's Decision**

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe impairments of "anxiety; depression; bipolar disorder; and schizophrenia" but that none of the conditions met or medically equaled the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 23-24). She found that for the relevant period, the reported conditions of chronic fatigue syndrome and post-partum psychosis were not medically determinable impairments (Tr. 24). The ALJ found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others;

-10-

concentration, persistence, or pace; and adapting or managing herself (Tr. 24). The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for work at all exertional levels with the following non-exertional limitations:

> She can perform simple, routine, and repetitive tasks, but not at a production pace so, for example, no assembly lines. She can respond appropriately to occasional interaction with supervisors and coworkers, but with no team or tandem work with coworkers and no interaction with the general public. She is further limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting. Any necessary changes need to occur infrequently and be easily and adequately explained (Tr. 26).

Citing the VE's findings, the ALJ determined that while Plaintiff was unable to return to any of her past relevant work, she could perform the unskilled, medium work of a janitor, detailer, and laundry work; light work of a folder, production inspector, and packer; and sedentary work of a bench worker, bonder, and assembler (Tr. 31, 82-83).

The ALJ discounted the allegations of disability. She cited January, 2015 treating records stating that Plaintiff denied symptoms of depression or anxiety (Tr. 27). She noted that March, 2015 records showed a "marked improvement" in psychological symptoms with medication and that by April, 2015, Plaintiff denied any hallucinations (Tr. 27). The ALJ cited May, 2015 records stating that Plaintiff was able to take classes and attend her son's soccer games (Tr. 27). She noted that Plaintiff did not experience an increase in symptoms until stopping her psychotropic medication (Tr. 27). The ALJ also cited 2016 and 2017 records showing that the hallucinations were quelled with medication (Tr. 28).

-11-

The ALJ accorded "little weight" to Dr. Gutterman's January, 2018 finding that Plaintiff would be unable to meet competitive work standards, noting that the treating assessment stood at odds with records showing that Plaintiff's condition was stable with medication (Tr. 28-29).   The ALJ noted that Dr. Gutterman's assessment was also inconsistent with Plaintiff's ability to attend her son's soccer games, interact with family, travel by train, and use of self-coping skills such as medication and relaxation techniques (Tr. 29).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).   The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).    However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

Plaintiff makes four separate contentions in favor of remand, arguing first that the Step Three finding that she did not equal a listed impairment 12.04 (schizophrenia) was not supported by a medical opinion as required by SSR 96-6p.  ECF No. 21, PageID.855; 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03.   She argues second that the ALJ erred by rejecting psychiatrist Dr. Gutterman's January, 2018 opinion of disabling psychological limitations.  ECF No.21, PageID.860.  Third, she contends that the Residual Functional Capacity ("RFC") composed by the ALJ for a limited range of light work does not meet the articulation standards set forth in SSR 96-8p.  ECF No. 21, PageID.864.  She argues fourth that the ALJ erred by rejecting her allegations of limitation.  ECF No. 21, PageID.865.

 Because the ALJ's rationale for declining to credit Plaintiff's professed degree of limitation also supports the choice of limitations found in the RFC, arguments three and four will be considered in tandem.

-14-

### A.  The Step Three Determination

At Step Three of the administrative sequence, "[a] Claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled [ ] and entitled to benefits." *Reynolds v. Commissioner of Social Security*, 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii). "Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (*citing* 20 C.F.R. § 404.1525(a)).  Disability can also be established at Step Three where a claimant shows that while she does not meet all of the requirements of a listed impairment, the condition medically equals one of the listed impairments.  "An impairment is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R §§ 404.1526; 416.926.  A finding of medical equivalence can be made where the claimant has an impairment found among the listed impairments that does not meet all of the requirements of the listing or, meets all of the requirements but "one or more of the findings is not as severe as specified in the particular listing;" provided that "other findings related to [the] impairment ... are at least of equal medical significance to the required criteria." § 404.1526(b)(1).  The claimant bears the burden of establishing that her impairments meet or medically equal a listed impairment. *Buress v. Sec'y of Health & Human Servs.,* 835 F.2d 139, 140 (6th Cir. 1987).

In opposition to Plaintiff's argument that the absence of an "equivalency" opinion by an acceptable medical source requires a remand, Defendant cites SSR 17-2p, which states that an ALJ may find that a claimant does not medically equal a listed impairment without the support of a medical opinion. ECF No. 25, PageID.881; SSR 17-2p, 2017 WL 3928306, at *4 (March 27, 2017).  Defendant's position is not well taken.  In the present case, because Plaintiff filed his claim for benefits before March 27, 2017, SSR 96-6p is applicable. 1996 WL 374180, at *3 (July 2, 1996); Hearing and Appeals Law and Litigation Manual ("HALLEX") I-5-3-30, 2017 WL 1362776, at *5 (last revised October 2, 2017)(prior rules to be employed for applications filed before March 27, 2017).  Under SSR 96–6p, a Step Three finding that a claimant does not medically *equal* an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 must be supported by a medical opinion. SSR 96-6p at *3 ("longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence ....").  Plaintiff is correct that under SSR 96-6p, a medical opinion is required.

Notwithstanding, Plaintiff's argument that the evidence does not include an equivalency opinion is without merit.  In November, 2016, Dr. Kennedy, a non-examining reviewer, considered Plaintiff's allegations of disability as a result of schizophrenia and affective disorders but determined that the conditions created only mild psychological limitation and were  non-severe (Tr. 106-107).  With nothing more, Dr. Kennedy's finding that Plaintiff was not disabled constitutes a medical determination that Plaintiff did not equal

-16-

a listed impairment (Tr. 111-112).  *See* SSR 96-6p at *3 (finding of non-disability by "a State

agency medical or psychological consultant . . . ensures that consideration" by a medical

expert "has been given to the question of medical equivalence").  Thus, Dr. Kennedy's

finding that the alleged mental impairments were non-severe satisfies the requirement under

SSR 96-6p for a medical opinion that Plaintiff did not medically equal an impairment listed

in 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

More generally, the ALJ's Step Three finding that Plaintiff neither met nor medically

equaled a listed impairment is well supported and explained (Tr. 24).  To medically equal

Listings 12.03 (schizophrenia), 12.04 (affective disorders), or 12.06 (anxiety-related

disorders, she was required to show one extreme limitation or two marked limitations in the

following areas:

1. understand, remember, or apply information;

2. interact with others;

3. concentrate, persist, or maintain pace;

4. adapt or manage oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.03, 12.04, 1206.  While the ALJ found that

Plaintiff experienced significant ("moderate") work-related limitations in these areas, she

declined to find the presence of any extreme or marked limitations (Tr. 24).  The ALJ

supported the finding that the psychological limitations were no more than moderate by

noting that Plaintiff regularly prepared her son for school, enrolled in college courses, drove,

-17-

shopped, attended soccer games, and crocheted (Tr. 24, 29).  As discussed in more detail below, the treating records for the relevant period showing that Plaintiff responded well to psychotropic medication, appeared well groomed and fully oriented, and displayed good judgment support the finding that she did not meet or medically equal a listed impairment. Because the ALJ satisfied both the procedural and substantive requirements for the Step Three analysis, a remand on this basis is not warranted.

### B.  Dr. Gutterman's Assessment

The ALJ also provided adequate reasons for according "little weight" to Dr. Gutterman's opinion that Plaintiff was unable to meet "competitive standards" for the performance of full-time, unskilled work (Tr. 29).

Case law in effect at the time of Plaintiff's application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§  404.1527(c); 416.927(c)).  In the presence of contradicting substantial evidence however, the ALJ may reject all or a portion of the treating source's findings, *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so.  *Wilson*, at 547; § 404.1527(c); SSR 96–2p at *5. In declining to give less than controlling weight to the

treating physician's opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) the "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

As discussed above, Dr. Gutterman found that due to schizophrenia, depression, and anxiety, Plaintiff was unable to meet the social, concentrational, and adaptive requirements for unskilled work (Tr. 583-584).   Despite Dr. Gutterman's opinion of disabling psychological limitation, the ALJ's accord of only "little weight" satisfies the procedural and substantive requirements for a treating physician analysis.   The ALJ acknowledged that Dr. Gutterman was a psychiatrist and had treated Plaintiff for schizoaffective disorder, bipolar type and a generalized anxiety disorder (Tr. 28).  She acknowledged Dr. Gutterman's opinion that Plaintiff was "'unable to meet competitive standards' in most areas of mental work-related functioning" and would require more than four days absences each month (Tr. 28). However, the ALJ noted Dr. Gutterman's findings appeared to be based at least in part on Plaintiff's subjective claims of "auditory hallucinations and fatigue" (Tr. 28).  The ALJ noted that Dr. Gutterman's findings were undermined by records showing that Plaintiff's condition was stable with medication (Tr. 29).  She noted that Plaintiff admitted to a relatively wide range of activities including attending her son's soccer games, participating in family holidays, and traveling by train (Tr. 29).  The ALJ's rejection of Dr. Gutterman's assessment is prefaced by a thorough discussion of the treating records for the relevant period, including

-19-

evidence that Plaintiff did not experience hallucinations while adhering to a prescribed regime of psychotropic medication (Tr. 28).

Dr. Gutterman's opinion of extreme limitation also stands at odds with my review of the treating records for the relevant period.    Plaintiff appeared well groomed and fully oriented with intact judgment after resuming the use of prescribed medications (Tr. 378, 652, 682, 760, 766).  While she claimed that she was "exhausted" after a grocery shopping trip, she appeared psychologically able to go out in public, travel, or attend group events (Tr. 593, 652).  The record indicates that she was able to pick her son up from school (Tr. 686).  While Plaintiff cites records indicating that she required injectable medication due to her inability to adhere to a prescription regime, the bulk of Dr. Qureshi's records show normal mentation, including treating notes from December, 2017 showing normal mood, affect, judgment, memory, and full orientation (Tr. 732).   The ALJ's rejection of Dr. Gutterman's opinion, well explained a supported by both the treating evidence and Plaintiff's own acknowledgments, does not provide grounds for remand.

### C.  The RFC and the Allegations of Limitation (Arguments Three and Four)

 The same evidence supports the ALJ's finding that Plaintiff retained the RFC for a significant range of unskilled work.

In determining a claimant's RFC, it is necessary to consider (1) objective medical evidence as well as (2) subjective evidence of pain or disability. §§ 404.1545(a)(1); 416.945 (RFC must be based on all "relevant evidence").  The "RFC is to be an 'assessment of [a

claimant's] remaining capacity for work' once her limitations have been taken into account" *Howard v. Commissioner of Social Security*, 276 F.3d 235, 239 (6th Cir. 2002).  In crafting the RFC, the ALJ must consider the restrictions alleged by the claimant. §§ 404.1545(b-d); 416.945; SSR 96-8p, 1996 WL 374184, at *6 (June 2, 1996).  "Although a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing." *Delgado v. Commissioner of Social Sec*., 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. March 4, 2002)(internal citations omitted). "[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.*

In support of the RFC, the ALJ provided a lengthy account of the treating records, noting that between January and March, 2015, Plaintiff experienced "marked improvement" in psychological symptoms by resuming psychotropic medication (Tr. 27).  She cited Plaintiff's neat appearance, normal thought processes, and normal concentrational abilities and memory (Tr. 27).  She noted a reduction in symptomology when Plaintiff was compliant with medical advice (Tr. 27).  She noted that reports of increased psychological symptoms coincided with Plaintiff's failure to take the prescribed medication (Tr. 28).  While Plaintiff alleges that her failure to adhere to the medication regime was attributable to cognitive problems, her claims stand at odds with observations of normal memory and concentration and her continued ability to prepare her school-age son for school each day, groom herself

-21-

appropriately, leave the house, interact with relatives, drive, and attend appointments on a regular basis.

Further, Plaintiff's claim that the ALJ impermissibly "played doctor" by drawing from several sources in crafting the RFC does not provide grounds for remand. It is well settled that an ALJ is permitted to draw from multiple medical sources in whole or part in crafting the RFC. *Rudd v. Commissioner of Social Security*, 531 F. App'x 719, 728 (6th Cir. September 5, 2013); SSR 96-8p at *2. Admittedly, none of the medical providers stated explicitly that Plaintiff experienced moderate psychological limitation as found by the ALJ (Tr. 24). However, she did not err in taking the *via media* between Dr. Kennedy's finding of only mild psychological limitation and Dr. Gutterman's finding of disability-level impairments. The ALJ noted that while Plaintiff experienced some degree of psychological impairment, the evidence from the relevant period included multiple unremarkable mental status evaluations and Plaintiff's acknowledged ability to perform errands, interact with others, and care for her son. As such, the ALJ's finding that Plaintiff experienced no more than moderate psychological limitation does not provide grounds for remand.

The ALJ's rationale for the partial rejection of Plaintiff's allegations of disability is supported by the same body of evidence. As required by SSR 16-3p, the ALJ acknowledged that the diagnosed conditions of schizophrenia, depression, and anxiety caused some degree of limitation (Tr. 23). 2016 WL 1119029, at *3 (Mar. 16, 2016). The ALJ evaluated Plaintiff's subjective claims that she slept for most of the day, did not perform household

chores, and experienced auditory hallucinations continually since October, 2013 (Tr. 27).
*Id.* at *3-4.  The ALJ partially credited Plaintiff's allegations by limiting her to work with
only occasional interaction with coworkers and supervisors, no tandem work, few workplace
changes, routine duties, and a stable, predictable work environment (Tr. 25-26).  However,
the ALJ permissibly concluded that the treating records showing normal mentation and the
acknowledged activities undermined Plaintiff's claim of disability level limitation (Tr. 27-
28). Because ALJ's rationale for partially crediting the allegations of limitation is well
supported and explained, the deference generally accorded to ALJ's evaluation of the
subjective claims is entitled to deference. *See Cruse v. Commissioner of Social Sec.*, 502 F.3d
532, 542 (6th Cir. 2007)(ALJ's determination is entitled to "great weight")(*see also
Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*citing Imani v. Heckler*, 797 F.2d
508, 512 (7th Cir. 1986))("ALJ's evaluation of the professed limitations must stand unless
'patently wrong in view of the cold record'").

Accordingly, I conclude that the ALJ's determination that  Plaintiff was capable of
a significant range of unskilled work at all exertional levels is well within the "zone of
choice" accorded to the fact-finder at the administrative hearing level and should not be
disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment [Docket #25] be GRANTED and that Plaintiff's motion [Docket #21] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

-24-

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/ R. Steven Whalen                        
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 10, 2020

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 10, 2020, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla                
Case Manager to the
Honorable R. Steven Whalen